UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM J. MURRAY, )<br><br>Plaintiff, )<br><br>v. )<br><br>TXU CORP., *et al.* )<br><br>Defendants. ) | CASE NO. 04-CV-12123NG<br><br>(Related to cause no. 3:03-cv-088P, United States District Court for the Northern District of Texas, Dallas Division) |

## MOVANTS' RESPONSE TO AMERICAN NATIONAL POWER, INC.'S POST-HEARING MEMORANDUM IN SUPPORT OF REQUEST FOR ATTORNEYS' FEES AND COSTS

Movants TXU Corp., TXU Energy Company LLC, and TXU Portfolio Management Company LP f/k/a TXU Energy Trading Company LP (TXU Portfolio Management)[1] respond to the "Post-Hearing Memorandum in Support of Fees and Costs (the Memorandum)" of American National Power, Inc. (ANP).

### BACKGROUND

ANP has needlessly turned the ordinary, a request for production of documents served on it, into the extraordinary, a satellite litigation of the most contentious sort imaginable. As a result, ANP has needlessly incurred tens of thousands of dollars in expenses that it now improperly seeks to recover from the TXU Parties.

**A.    The underlying suit.**

The underlying lawsuit (the Murray Action) is an action brought against the TXU Parties by William J. Murray (Murray), TXU Portfolio Management's former Senior Vice President of

---

[1] Hereinafter, Movants will be referred to collectively as the "TXU Parties."

Capital Management. During his employment, Murray expressed concerns about the TXU Parties' financial disclosures and accounting practices in various respects. After his employment was terminated as part of a corporate reorganization, Murray sued the TXU Parties for more than $10 million, claiming (1) they violated § 806 of the Sarbanes-Oxley Act of 2002 because his termination was in retaliation for the expression of his concerns, and (2) TXU Portfolio Management breached his incentive compensation agreement because it failed to pay him all the incentive compensation due under it.

To establish a claim under the Sarbanes-Oxley Act, Murray must, among other things, show that he reasonably believed that the TXU Parties violated the federal securities or other applicable laws. To do so, Murray, in part, relies on his ANP employment, which immediately preceded his TXU Portfolio Management employment and during which he claims to have had extensive "finance" and "accounting" responsibilities and experience. Murray, who is an attorney, also relies on his alleged practice of corporate and securities law before working for TXU Portfolio Management.

**B.    The TXU Parties' initial subpoena duces tecum and motion to compel.**

Needless to say, the TXU Parties, in an effort to discover, among other things, whether Murray's claims about his prior legal, finance, and accounting experience, were true and the nature and scope of his legal, accounting, and finance experience and work at ANP,[2] served a subpoena duces tecum on ANP (the Initial Subpoena) asking it to produce all of its records

---

[2] As pointed out at the October 27, 2004 hearing, the TXU Parties also believe that (1) as ANP also had an incentive compensation plan, documents regarding Murray's participation in it are relevant to Murray's breach of contract claim, (2) the terms of Murray's ANP employment and severance are relevant to Murray's damages and the mitigation of his damages, and (3) any complaints by Murray about ANP's or its affiliates financial disclosures or accounting are relevant to his claim that his complaints about the TXU Parties' financial disclosures and accounting practices were reasonable.

concerning Murray.   ANP, after first advising the TXU Parties that it would produce the
requested documents, TXU Parties Motion to Compel (the Motion to Compel) Exh. G, ¶¶ 4-5,
objected to the subpoena in its entirety as overly broad and burdensome, *id*. Exh. H.

On March 5, 2004, about two months after the Initial Subpoena's service, the TXU
Parties filed the Motion to Compel.[3]  Not content with filing only an opposition to the motion
(the Opposition), ANP also: (1) obtained leave to file a surreply (the Surreply), (2) filed a motion
to strike (the Motion to Strike) allegedly false statements in the TXU Parties reply in support of
their Motion to Compel (the Reply), even though its Sur-Reply responded to them, and (3)
served on the TXU Parties, but did not file, a sanctions motion and supporting memorandum
under Federal Rule of Civil Procedure 11 (collectively, the Rule 11 Motion), Wise Aff. Exh. L,[4]
even though Rule 11(d) makes clear that Rule 11 sanctions cannot be awarded with respect to
"discovery requests, responses, objections, and motions that are subject to Rules 26-37."[5]

## C.    The TXU Parties' post-Motion to Compel efforts to obtain ANP's deposition and documents.

Although briefing on the Motion to Compel was completed in early May 2004, no ruling
on it was forthcoming.  In light of both the unexpected delay in obtaining a ruling[6] and in light of
the fact that the TXU Parties were scheduled to depose Murray in the near future, their attorney
contacted ANP's attorney, in early August 2004, about both scheduling ANP's deposition and

---

[3] As illustrated by the various affidavits filed by the parties in connection with the Motion to Compel, there is great disagreement about the events that transpired before the Motion to Compel's filing.

[4] The Rule 11 Motion, like the Surreply and the Motion to Strike, also related to the alleged misrepresentations in the Reply.  See Wise Aff. Exh. L.

[5] It appears that ANP is seeking to recover fees for both the Motion to Strike and the Rule 11 Motion.  See Carter Aff. Exh. A (time entries for April 8-27, 2004).

[6] The TXU Parties' local counsel contacted the Court on several occasions about the Motion to Compel's status.

3

obtaining its documents. Wise Aff. Exh. A. The TXU Parties' attorney, in an effort to do so, provided ANP's attorney with a draft subpoena (the Second Subpoena). *Id*. As ANP had so vociferously complained that the Initial Subpoena was overly broad and unduly burdensome, the Second Subpoena's document request contained limited and specific categories of documents that ANP was to produce. *Id*. Exh. D. Thereafter, the parties' attorneys had many communications, by telephone, email, and letter, with respect to scheduling ANP's deposition and obtaining its documents. *Id*. Exhs. G - J. In a final effort to resolve the dispute and obtain ANP's deposition and documents, the TXU Parties' attorney, in a September 20, 2004 letter, advised ANP that, the TXU Parties would (1) serve the Second Subpoena and, subject to their right to later move to compel if they believed that ANP improperly withheld information and/or documents, would accept whatever documents and testimony ANP was willing to produce in response to it, (2) agree to a protective order protecting ANP's confidential and proprietary information, and (3) pay ANP $2500 for its troubles. *Id*. Exh. B.

ANP flatly rejected the offer, insisting that, before it produced a single document, the TXU Parties had to agree both to reimburse it "between $18-19,000" in costs incurred in responding to the Motion to Compel and to pay all its future production costs. *Id*. Exh. C. Consequently, on October 5, 2004, the TXU Parties wrote the Clerk of the Court a letter requesting a hearing on their Motion to Compel. *Id*. Exh. K. They also served the Second Subpoena, which was objected to in its entirety. *Id*. Exh. D.

A hearing was held on the Motion to Compel on October 27, 2004. The TXU Parties' recollection of the hearing differs greatly from ANP's. Whereas the Memorandum claims that the Court ruled "that it would defer ruling on whether ANP is entitled to recover all or a portion of [its] expenses, until after it reviewed communications between the parties to determine if ANP

had offered to produce Murray's personnel file before TXU filed its Motion instigating this litigation," and that "the only material that can be reasonably demanded of ANP is [Murray's] personnel file," Memorandum at 2, 7, the TXU Parties do not recall such rulings. Rather, they recall the Court saying that, after reviewing the record, it would decide if an award of expenses was warranted and that it initially would order ANP to produce Murray's personnel file, subject to the TXU Parties' right to move for leave to seek additional ANP documents.

More important, in an attempt to paint the TXU Parties as both being as unreasonable, inflexible, and unyielding as possible and as improperly demanding strict compliance with the Initial Subpoena throughout this dispute, the Memorandum ignores facts that show both the contrary and ANP's unreasonable, inflexible and unyielding behavior. For example, the Memorandum fails to mention that, before filing their Motion to Compel, the TXU Parties advised ANP that (1) it did not have to restore archived email servers to produce emails in response to the Initial Subpoena, (2) they would reimburse ANP for its reasonable production expenses, (3) they would enter into a protective order to protect ANP's confidential and propriety information, and (4) they would accommodate ANP on the timing of its production. See Reply at 4 & Exh. A, ¶ 3.[7]

The Memorandum also ignores ANP's improper behavior. For example, even though ANP acknowledged from the outset that, at the minimum, Murray's personnel file was discoverable by the TXU Parties and even though the file has always been in its Personnel Director's office, Motion to Compel Exh. I, ¶ 6. ANP steadfastly refused to produce it or any other documents to the TXU Parties, hiding instead behind its global objection to the Initial

---

[7] The TXU Parties even sent ANP a draft protective order.

Subpoena and its position that the TXU Parties should not be allowed to obtain any documents from ANP unless and until they could prove that they could not obtain them from Murray or another source. ANP's unyielding position in this dispute appears, in large measure, to be motivated not by the Initial Subpoena's scope, but rather by its inability to readily locate documents about Murray or any other subject because its documents apparently are in total disarray. As ANP's attorney incredibly claimed at the October 27, 2004 hearing and as he told the TXU Parties' attorney, ANP, when moving its offices from Houston to the Boston area, simply dumped its documents in more than 600 unlabeled and un-indexed boxes. Accordingly, it cannot determine which box contains which documents. Wise Aff. ¶ 11.

Finally, and perhaps most disturbing, in its zeal to paint the TXU Parties in the worst possible light and to extract the maximum amount of expenses from them, the Memorandum misstates and exaggerates the facts. For example:

> ➢ Page 2 of the Memorandum claims that "the two law firms representing TXU . . . filed a succession of pleadings." In fact, the TXU Parties filed a *single* Motion to Compel, accompanied by supporting and reply memoranda. In contrast, ANP, in addition to the Opposition, sought leave to file the Surreply and prepared two superfluous and unnecessary motions: the Motion to Strike and the Rule 11 Motion.[8]

> ➢ Page 3 of the Memorandum claims that "[t]he substantial amount of fees and costs incurred by ANP is a direct reflection of TXU's unrelenting and inflexible demands that ANP fully comply with the [Initial] Subpoena . . . ." As discussed

---

[8] Of course, the TXU Parties responded to ANP's motion to strike.

above, the TXU Parties *never* demanded full compliance with the Initial Subpoena. To the contrary, they told ANP that it did not have reconstruct its email server to produce emails. Just as important, they offered to pay ANP's reasonable costs of producing the requested documents. And, ANP's accusation wholly ignores the TXU Parties' good-faith attempt, during August and September 2004, to resolve the dispute amicably and without court intervention by offering both to withdraw the Initial Subpoena and the Motion to Compel, to accept whatever documents ANP agreed to produce, and to pay ANP $2500 for its troubles. See p. 4 *supra*.

➢ Page 3 of the Memorandum, after pointing out that the Initial Subpoena was served on January 15, 2004, complains that it "did not substantiate the relevancy of the requested documents. Nor did TXU demonstrate any substantial need for the vast scope of materials covered by the Subpoena." Of course, this ignores the fact that (1) the TXU Parties were not required to substantiate "the relevancy of the requested documents" when they served the Initial Subpoena, and (2) the documents related to Murray's ANP employment are relevant for the myriad of reasons discussed above, see pp. 2-3 & n.2 *supra*, and in TXU's Memorandum in Support of the Motion to Compel (at 2-4, 6-8) and the Reply (at 2-3).

➢ Pages 5-6 of the Memorandum claim that "[e]ven after the parties had fully brief TXU's Motion, and were awaiting a ruling from the Court, TXU refused to let this matter rest. . . . After a series of correspondence (copies of which TXU filed with the Court on October 5, 2004), TXU refused to agree to meaningful limits on

the scope of discovery . . . ." As discussed above, the Second Subpoena was not only limited and focused, see Wise Exh. D, but the TXU Parties also eventually told ANP that they would accept whatever documents ANP produced in response to it, subject to their right to move to compel if their deposition of ANP revealed that ANP had improperly withheld relevant documents, *id*. Exh. B.

➤ Page 6 of the Memorandum claims that the TXU Parties' October 5, 2004 letter "mischaracterized ANP's recent efforts to resolve this discovery dispute. Once again, ANP was forced to incur fees to respond to TXU's accusations and clarify the record in this case." The TXU Parties' letter did not mischaracterize anything. To the contrary, after pointing out the documents relating to the parties' August and September 2004 discussions were attached and that the parties' "efforts [to resolve the matter] have been unsuccessful because the parties cannot agree upon either the documents that ANP will produce or the subject matters about which it will testify and because ANP is insisting that the TXU Defendants pay approximately $18,000, representing its costs in connection with the pending motions, plus any costs it incurs in producing its documents," the letter requested a hearing on the Motion to Compel. See Wise Aff. Exh. K. Moreover, ANP's response to the letter, which was filed as an afterthought, three weeks after the letter was filed and the day before the Motion to Compel hearing, merely complained that the letter was an improper communication with the Court because it was not a formal "motion" and offered to respond to "the [letter's] allegations concerning the parties' respective efforts to resolve this dispute." See ANP's Response to TXU's October 5, 2004 Letter to the Court ¶ 8.

## ARGUMENT

A.   **ANP is not entitled to recover its any of its expenses.**

Under Federal Rule of Civil Procedure 37(a)(4)(B), a prevailing non-movant is entitled to recover its reasonable expenses incurred in opposing a Motion to Compel only if the motion was not "substantially justified" and no "other circumstances make an award of expenses unjust." Without mentioning Rule 37 or its standard, the Memorandum (at 7) appears to argue that ANP is entitled an expense award here because this dispute could have been avoided if the TXU Parties had limited the Initial Subpoena to Murray's personnel file. This argument is too simplistic.

*First*, it ignores ANP's response to the Motion to Compel. Neither the Opposition nor the Surreply took the position that ANP's document production should be limited to Murray's personnel file. To the contrary, they argued that the Motion to Compel should be denied in its *entirety* and that a protective order, precluding the TXU Parties from obtaining a single piece of paper from ANP until they jumped through the following hoops, should be entered:

> A.   No discovery shall be ordered from ANP unless or until TXU demonstrates to the Court the following:
>
> 1.   Specific steps taken by TXU to obtain from William Murray the documents its seeks from ANP (the "Requested Documents").
>
> 3.   If TXU contends that the Requested Documents could not be obtained from William Murray, specific facts demonstrating such unavailability and the efforts pursued by TXU to obtain such information.

Opposition § III.D and proposed Protective Order.[9]

---

[9] Even though the Opposition (§ III.B.) mistakenly claimed that the TXU Parties, in their Motion to Compel "allege[] that it [*sic*] would be satisfied with obtaining only the information contained in a file in ANP's possession in its Massachusetts office[, that is Murray's personnel file,]" nothing in the Opposition or the Surreply offered to produce the file.

*Second*, and more important, ANP's argument ignores the fact that the TXU Parties *never* believed that Murray's employment file contained all the relevant documents.  For example, there was no reason for them to believe that his personnel file contained (1) information sufficient to allow them to determine if Murray, during his ANP employment, provided legal services to ANP or if he had responsibility for its financial disclosures or accounting, much less the nature and scope of such services and responsibility, or (2) any information about whether Murray ever expressed concerns about ANP or its affiliates' financial disclosures or accounting during his ANP employment, much less the nature of those complaints.[10]  Thus, the TXU Parties had substantial justification for not limiting either the Initial Subpoena or their Motion to Compel to Murray's personnel file.

*Third*, ANP's argument ignores its own unreasonable, inflexible, and unyielding conduct in this dispute.  For example, it ignores the fact that it neither produced Murray's personnel file in response to the Initial Subpoena nor offered to produce it in the Opposition or the Surreply.  ANP's argument also ignores the TXU Parties' pre-Motion to Compel offer to reimburse ANP for its reasonable costs incurred in producing documents.

*Fourth*, ANP's argument ignores the fact that it is largely responsible for the acrimonious nature of, and substantial costs associated with, this dispute.  Rather than simply arguing the merits of its position that the Initial Subpoena was overly broad and burdensome in the Opposition, every ANP paper filed in this dispute, including the Memorandum, accuses the TXU Parties and their attorneys of dishonesty, bad faith, and improper conduct.  To establish this, ANP needlessly wasted thousands of dollars preparing the Surreply, which largely regurgitated

---

[10] The documents in Murray's personnel file do not contain such information.  Wise Aff. ¶ 12.

the arguments in the Opposition, filing the Motion to Strike, which largely regurgitated the arguments in the Surreply, and serving the Rule 11 Motion in violation of Rule 11(d).

*Fifth*, and perhaps most important, ANP's argument ignores the fact that the Court's November 8, 2004 Protective Order does not limit the TXU Parties to Murray's personnel file, but rather permits them to seek additional documents upon leave of the Court.

In light of the foregoing, particularly the Opposition's position that ANP should *not* be ordered to produce *any* documents, much less Murray's personnel file, until the TXU Parties established that they were unable to obtain them from another source and the fact that the personnel file does *not* contain most of the relevant types of documents sought by the TXU Parties, it is difficult to conclude that ANP prevailed on the Motion to Compel or that the Motion to Compel was without "justification." In addition, ANP's improper behavior in this dispute makes an award of expenses against the TXU Parties "unjust." See 7 *Moore's Federal Practice* § 37.23[3], at 37-46.1 (3d ed. 2004) ("The drafters [of Rule 37] suggest one such circumstance [in which an award of expenses would be unjust] might arise when the 'prevailing party also acted unjustifiably.'" (*quoting* Fed. R. Civ. Pro. 37(A)(4) advisory committee's note)).

## B.   ANP's expenses are unreasonable or were not incurred in opposing the Motion to Compel.

Sanctions imposed against a party or attorney responsible for taking the position that the court rejected in ruling on a Motion to Compel are limited to the "*reasonable* expenses incurred *in opposing* the motion." Fed. R. Civ. Pro. 37(A)(4)(B) (emphasis added). *See also Foxley Cattle Co. v. Grain Dealers Mut. Ins. Co.*, 142 F.R.D. 677, 681 (S.D. Iowa 1992); 7 *Moore's Federal Practice, supra* § 37.23[6], at 37-51. Here, ANP is seeking about $39,000 in expenses. See Memorandum at 2 & Carter Aff. The expenses relate to four basic activities: (1) the preparation of the Opposition, (2) the preparation of the Surreply, the Motion to Strike, and the

11

Rule 11 Motion, (3) the August and September 2004 discussions about the Second Subpoena, and (4) the October 27, 2004 hearing and its aftermath. As will be discussed below, most of the expenses either are unreasonable or were not incurred in opposing the Motion to Compel.

### 1.    The fees relating to the Opposition are unreasonable.

According to the billing statements attached to the Carter Affidavit, it appears that three different attorneys spent more than eight working days (about 66 hours), at a cost of more than $16,000, preparing ANP's Opposition. This is grossly excessive.

At the outset, it is unclear why three attorneys were needed to prepare the Opposition or why so much time was spent on it, given the dispute's simple and straightforward nature.[11] Moreover, a review of the April 2004 invoice, Carter Aff. Exh. A, suggests that the effort to prepare the Opposition was wasteful and unorganized. For example, it appears that Attorney Day began drafting the Opposition on March 16, 2004 *before* any legal research had been conducted. Carter Aff. Exh. A.[12] Similarly, it is unclear why two attorneys, Attorneys Day and Angelini, needed to conduct legal research, particularly since the Motion to Compel did not involve any complex legal issues. Further, it appears that two attorneys, Attorneys Carter and Day, spent an inordinate amount of time revising the Opposition. *Id*. Thus, after previously spending about 11.50 hours on the Opposition, Attorney Day appears to have spent more than 20 additional hours (on March 18, 19, 21, and 23) revising it, and Attorney Carter appears to have spent more than eight hours (on March 21 and 22) doing the same. *Id*. Incredibly, Attorney Day

---

[11] This is highlighted by the fact that the Opposition only cites seven cases, most of which relate to the conference requirement.

[12] Attorney Day spent 11.50 hours drafting the Opposition on March 16 and 17, while Attorney Angelini was researching issues on March 17. Carter Aff. Exh. A. In addition, while Attorneys Day and Carter were spending another seven hours revising the Opposition on March 18, Attorney Day was conducting legal research on both March 18 and 19. *Id*.

spent 1.6 hours revising the Opposition on March 23, 2004, the day *after* it was filed with the Court, to correct errors in the Opposition, as originally filed.

### 2. The fees relating to the Surreply, the Motion to Strike, and the Rule 11 Motion were unreasonable.

As pointed out above, ANP not only filed the Opposition, but it also filed the Surreply and the Motion to Strike and served, but did not file, the Rule 11 Motion. As none of these papers were necessary, as the Motion to Strike was not granted, and as the Rule 11 Motion was improper, see pp. 3, 10 *supra*, the expenses incurred by ANP in connection with them were unreasonable and, therefore, unrecoverable. Moreover, it appears from the May 2004 invoice, Carter Aff. Exh. A, that two different attorneys spent about more than eight working days (about 66 hours), at a cost of more than $16,000, preparing those papers. This is grossly excessive.

### 3. The expenses relating to the Second Subpoena are not recoverable.

The last page of Exhibit A to the Carter Affidavit and the first page of Exhibit B to that affidavit reflect expenses incurred in connection with the Second Subpoena. As this time did not relate to ANP's efforts to "oppose" the Motion to Compel, they are not recoverable.[13]

**Wherefore**, Movants request that the Court deny ANP's request for expenses.

---

[13] The time spent on ANP's response to the TXU Parties' October 5, 2004 letter requesting a hearing on the Motion to Compel perhaps best illustrates the unreasonableness of ANP's attorneys' fees. According to Exhibit B of the Carter Affidavit, Attorneys Carter and Day, at a cost of more than $1500, collectively spent more than *five* hours preparing the 2½-page response, which simply complained that the letter was an improper communication with the Court and offered to provide ANP's perspective on the August and September 2004 discussions about the Second Subpoena, if the Court directed it to do so.

Dated: November 18, 2004.

Respectfully submitted,

**TXU CORP., TXU ENERGY COMPANY
LLC, AND TXU PORTFOLIO
MANAGEMENT COMPANY, LP, F/K/A
TXU ENERGY TRADING COMPANY LP**

By Their Attorneys

Anita B. Bapooji (BBO #644657)
TESTA, HURWITZ & THIBEAULT, LLP
125 High Street
Boston, MA 02110
(617) 248-7000

Robert K. Wise
Patricia S. Gill
HUNTON & WILLIAMS, LLP
Energy Plaza, 30th Floor
1601 Bryan Street
Dallas Texas 75201
(214) 979-3029

## CERTIFICATE OF SERVICE

On November 18, 2004, a true and correct copy of the above and foregoing response was served by regular U.S. mail on:

Plaintiff William J. Murray's Counsel of Record, Hal K. Gillespie, Esq. and Yona Rozen, Esq., Gillespie, Rozen & Watsky, 3402 Oak Grove Avenue, Suite 200, Dallas, Texas 75204.

Respondent ANP's attorney, Christopher H.M. Carter, Hinckley Allen Snyder LLP, 43 North Main Street, Concord, New Hampshire 03301-4934.

Anita B. Bapooji

14